All right, when you have a chance to get settled, the next case of the morning is number 2410760, McNutt v. Morris. But take your time getting settled. Ms. Tan. Good morning, your honors, and may it please the court. Caroline Tan for the government. It is common ground that Congress can tax spirits and that it has done so for centuries. It is also undisputed that Congress can collect those taxes. And there can be no reasonable dispute that Congress can also take steps to protect those taxes, including by preventing tax evasion. That is what these narrowly tailored location restrictions do. Plaintiffs fail to establish any injury from these provisions, and their arguments on the merits amount to a disagreement with the choice that Congress made over 150 years ago. But that is a choice that belongs to Congress, and it was a rational choice in service of protecting tax revenue and should be upheld. I welcome the court's questions. I'd like to start with the location provisions at issue. If you look at section 5178B, these provisions specifically only prescribe the placement of plans in certain areas on residential premises. I think this is an important point for the court to remember that these are not broad categorical bans on distilling, broadly speaking, nor is it a broad categorical ban on distilling at home. That's one of the critical reasons why plaintiffs don't have standing in this case to bring a pre-enforcement challenge, because their declarations at no point assert an intent to violate these particular provisions at issue. Well, the law says, it doesn't say residential premises, if I recall correctly, it says connected to the home, right? I think you're referring to the shed, yard, or enclosure connected with any dwelling house. That's correct. Or shed or enclosure connected with any dwelling house. So your contention is that if you have a 2-acre property and you put your shed at the back, that that's not within the purview of the statute? I mean, the agency would look at every application on a case-by-case basis, but yes, Mr. McNutt's shed, for example, located 260 feet away from his residence would be a permissible place to distill. And that's in part why he received an alcohol fuel permit back in 2014 or 2015. That's a narrowing construction, because McNutt is the one who received the threatening letters. Is he not? That is the reason the district court thought Mr. McNutt was the only plaintiff with standing in this case, but that notice actually, I mean, I wouldn't characterize it as a threatening letter, Your Honor, if you look at the notice. Well, why would they have sent a notice at all if, by definition, it was perfectly legal for him to still back where his ethanol production thing was? Well, Mr. McNutt applied for the permit after receiving this notice, applied for the permit, and received the permit to distill fuel alcohol in the shed following this particular notice, which I think sort of underscores why it's not a threat as opposed to a reminder about its obligations under the law. I understand. Your contention is that Mr. McNutt could have received a permit to produce distilled spirits in that shed because it's not physically connected to the dwelling house?  And the two plaintiffs whose declarations refer to having a garage that presumably is attached to the house, that would be an impermissible use of the equipment. That would not be approved. Is that correct? I don't think there are two plaintiffs who have discussed a garage connected to the dwelling house. I think there's one individual who talks about a garage near the dwelling house. That's the sort of thing that the agency would have to look at and determine whether or not this particular enclosure is sufficiently connected. I do want to emphasize that even those individuals have not alleged an actual intent to violate the specific restrictions here, the placement of the still in a particular location. All of them have generally sat at home in a colloquial sense, but the statute here is narrowly tailored to certain areas on residential premises. It doesn't sweep that broadly. And this jumps to the plainly adapted test. I know we're focused on standing, but while we're on this issue, my understanding is the government supports the statute by contending that it's difficult to monitor and as a result to calculate and collect the taxes imposed on distilled spirits produced inside a dwelling house. But you're saying that as long as they do it 200 feet away in an enclosed shed that the government can readily determine what's produced there? I'm not sure what the difference is between the government's ability to look into a house as opposed to a shed that's 200 feet away from the house. So the question is whether the choice that Congress made was reasonable. It is possible, of course, that Congress could have made a different choice or chosen to swept more broadly. But the fact that Congress decided to draw the line where it did, the only question is whether that particular line is reasonable. And so there could be some hypothetical situations where you might imagine, well, you know, I don't really understand why this particular site is easier than another site. But the question is not whether Congress drew in some senses a perfect line, but whether the line that Congress did draw here is reasonable. That's a consistent test that the Supreme Court has emphasized applies in cases regarding the scope of the necessary and proper clause. And I think that if you look at the long, if you look at the history in this particular case and the structure of these actual provisions, it's the only conclusion that you can reasonably draw is that this particular line was reasonably drawn in the context of, you know, spiritual spirits. I think there's another unique feature of this scheme that I wanted to emphasize. The spirits, in the spirits taxing scheme, the tax attaches at the point of creation, so the moment that the spirits are taxed. And that's somewhat unique from other sorts of items that, if anything, I think emphasizes the close nexus between what Congress did here and its protection of the tax revenue, the tax attaches at the moment of creation. And so this is a part, they're also taxed by proof. And I think both of these unique features of the scheme kind of emphasize why the choice that Congress made in this case is reasonable. Is it, does the record, sort of flipping back to Stan, does the record indicate whether the notice that was sent to Mr. McNutt is a notice that the government sends to every individual who the government learns has purchased this equipment? So one of our declarations in district court discussed this in particular. I think that was Mr. D'Angelo, and you can find the start of his declaration at ROA.536. He explained the context in which this notice was sent. It's not, it was sent in 2014. It has, to my understanding, the agency has not sent any further notices of this type since then. But the declaration describing more, I mean, to the extent you're curious about more context, you can see it in the declaration. I'm, of course, happy to talk about it if you would like. But another point that I wanted to emphasize about the notice is that TTB, the agency here, did not initiate any federal enforcement actions or criminal investigations following this notice. And Mr. McNutt, in fact, received a permit to distill fuel alcohol in his shed. Well, he wasn't distilling alcoholic beverages. He was distilling fuel alcohol. That would have been pretty shocking if they had tried to take enforcement action against him. Well, generally speaking, Your Honor, if a location has been approved for fuel alcohol, that means that location is also permissible for beverage alcohol. I mean, the agency would look at things on a case-by-case basis. But generally speaking, with respect to the location provisions here, if you get a permit for one, that generally means the agency thinks that is also a permissible location for the other. Was that in your briefs? Yes, Your Honor. I mean, we have discussed throughout the fact that Mr. McNutt's— So you're saying it was just a little add-on to McNutt's already approval for ethanol that he was going to make his own whiskey or something? He would have to apply for a permit for beverage alcohol. But because the agency has made a determination that that shed is permissible for fuel alcohol, then that location would not be impermissible for beverage alcohol as a general matter. I mean, we're only talking— the challenge provisions here— Then why was he receiving a threatening letter? So I would dispute that it's a threatening letter, Your Honor. I think it's more reasonably read as a reminder of his obligations under the law. I don't have it. I know where it is, and I've read it. And there's plenty in there that says, you do anything like this, and we're going to sue the pants off you or send you to jail. I mean, it's pretty direct in what are the consequences if you violate. And if he already had the ethanol permit, does that mean that the government routinely sends out warning letters to everyone with an ethanol permit and says, oh, by the way, you may have this one, but you can't get the other one? No, Your Honor. My understanding is the agency hasn't sent a notice like this. I mean, well, if the notice was simply some kind of advisory that was on some kind of generic list of ethanol, then it could have said, instead of saying, we'll put you in jail if you violate the no residential distilling, it could have said, well, we see you have an ethanol permit, and now it's possible that you may legally get a permit to do whiskey. I think the problem is that none of the plaintiffs here have even applied for a permit, and so they haven't even taken that initial step. You're saying that letter is meaningless, but my point is it's not meaningless. Well, the letter itself doesn't discuss these particular location restrictions. It mentions only, it reminds individuals about the law regarding production of distilled spirits and possession of an unregistered still, but it doesn't actually talk about placement of the still, which is the provisions that are being challenged in this case. And standing does have to be- Does it talk about personal use, distilled spirits for personal use? The provisions that are challenged here are only the location restrictions. The notice itself. Right. I am looking at it right now. It says you may have purchased the still. It reminds individuals that there are no exemptions for production. I see production. I see possession. I think the point that I really wanted to emphasize is it says nothing about location, and that's what's actually challenged here. And so their fear of enforcement has to be key to the actual provisions that they're challenging. The letter says nothing about location, but you're also saying that if the ethanol, if it's approved for ethanol, then it's automatically approved, at least location-wise, it's automatically approved for a still. As a general- Is that what you're saying? Yeah. As a general matter, if the agency has determined that one location is acceptable for fuel alcohol, then generally it is also acceptable for beverage alcohol. And that's why we ask individuals to apply for a permit in the first place. None of these individuals have done that. And were they to go through that route- Acceptance is based on, at least in part, the location. Location is one thing that's considered, yes. I think it's also important to emphasize that there is another route through which individuals that doesn't require risk of arrest or prosecution to the extent that this is something they're afraid of. I mean, they can always apply for a permit and see if it gets accepted. And if it gets denied, it can challenge location restrictions through that particular avenue. But there's no requirement that they face arrest, which is what they're sort of asserting in this case. I did want to get to the merits for a bit, if your honors wouldn't mind. I think the important thing here is that the through line in all the cases regarding Congress's necessary and proper powers is that you need a logical relationship and not a temporal one. There's no real dispute here that these particular location restrictions are sandwiched between two provisions that discuss affording security to the revenue. That these provisions also cross-reference a separate section also about affording security to the revenue. And that this law, which was passed over 150 years ago, was passed in response to widespread tax evasion, specifically with respect to spirits. Congress then reasonably made the decision that in order to protect its spirits tax revenue and prevent further evasion, it was going to place narrow restrictions on the permissible locations where individuals can place their distilled spirits plant.  Is it your contention that if Congress can tax a product that can be produced within a home, then Congress has the ability to prohibit the production of that item in the home because monitoring would be too difficult? So I have two responses, your honor. The first is that this law was passed over 150 years ago and Congress has done nothing of that sort. I think that would undermine any fear about a parade of horribles that might come from holding this particular law as validly exercised under Congress's powers. I think the second is that there may be circumstances in which Congress may want to take some other steps to protect tax revenue, but that would be a question for Congress to decide. There are unique features of this scheme that make this case a particularly strong one, one of which is that the tax attaches at the point of creation. And so the moment that alcohol is created, the tax already attaches. And that gives Congress a particularly strong interest in enacting these kinds of location restrictions that might, that don't necessarily, you know, extend to concerns. Well, suppose it was child labor. Suppose, suppose Congress said, suppose there were, suppose Congress changed law on child labor and, you know, 16-year-olds could work for wherever, whenever, except in the home. And you hire, but Congress said you can't employ a child in the home. So again. Again, that would be, that would be not using the tax power to collect taxes, but using the tax power to prohibit behavior. So I see that my time is up, Your Honor, of course. No, please. We're not asking you to break new ground here. This is a law that's been on the books for 150 years. Congress has not done anything of that sort. I'm not saying this is, I'm not saying that this is the easiest case, but I do see in the Sebelius case, Congress's authority under the taxing power is limited to requiring an individual to pay money into the federal treasury, comma, no more. If a tax is properly paid, the government has no power to compel or punish individuals. So I think you're referring to plaintiff's argument about they should have the choice to either, they should either essentially have the choice to do X or to not do X. Well, no, I mean, I take this sentence, and I don't think it's out of context, to mean that the taxing power is to use to tax. It is not to be used to regulate primary conduct. Now, I understand there are all the other cases about how do you package, how do you pay still, or brew, or whatever you're doing, but those are all associated with activity that is not prohibited. So the question here is whether- To collect a tax. Right. The question here, though, is about whether Congress acted necessary and proper to its taxing interest. And so under Comstock, for example, the Supreme Court has said that Congress can take steps that are more than one step away from its interest in the enumerated power as necessary and proper to that particular power. And that's why Comstock also discussed a case called Sabri, in which the Supreme Court said that Congress's power to appropriate money involves the power to stop graft, which also involves the prophylactic power to criminalize bribes. And it upheld, so it, when we're talking about the necessary, the scope of Congress's necessary and proper power, we're thinking about the steps that Congress can take that are sufficiently related to their enumerated interest. Those are under different provisions, all right? Either commerce or whatever. But this is the tax power. This is not the commerce power. It's the necessary and proper power under two Congress's enumerated powers. I understand that, but the necessary and proper power is not a fundamental source of authority. You have to go back to collecting revenue. That's correct, Your Honor. And you're trying to not collect revenue by saying you can't do alcohol distilling in your house. We are trying to stop— But you can do it 100 yards away if you have a big property. We are trying to stop— You know, I bet you've, I bet a whole lot of moons—no, this is under prohibition, of course, but a whole lot of moonshiners could exist under the qualification that you're attaching to this connected to. And Ms. Stanton, just to follow up with Judge Jones's question on that same quote, it does end on this choice issue, right? But imposition of a tax nonetheless leaves an individual with a lawful choice to do or not to do a certain act so long as he is willing to pay a tax levied on that choice. What choice did the plaintiffs here have? So plaintiffs have never contested that they lack a choice to distill spirits. And that is still a choice that they have and one that they can exercise. In fact, Mr. McNutt has been doing so in that particular shed. The fact that a particular law may regulate the way in which an individual conducts a taxable activity does not render it invalid under the governing law in this particular body of cases. The only question, and I think that a lot of their points really just underscore the fact that they disagree with this particular law. They say, why didn't it happen this way? Why didn't Congress do X? Why didn't Congress do Y? That's not the relevant test. The test is whether the line that Congress chose is reasonable. And if there are no further questions, I am happy to- You have rebuttal. Thank you. All righty, thank you. Mr. Grossman. Good morning. May it please the court. The federal prohibition on home distilling exceeds Congress's enumerated powers and invades the police power reserved to the states. The government's abandonment of its argument that the prohibition can be sustained under the Commerce Clause, which is Congress's most sweeping source of regulatory authority, pretty much dispels any notion that the same measure could be supported as necessary and proper to the execution of the much more limited, in the regulatory sense, taxing power. So far as necessity is concerned, prohibiting practically every individual American from undertaking distilling, the taxable activity, is not plainly adapted to the collection of tax revenue. It is, in fact, the opposite. And the awesome power to prohibit practically any activity taking place in homes through the contrivance of a tax would be an enormous expansion of Congress's authority, and it's by no means proper. The government refuses, and as I refused in the argument just made, to identify any limiting principle to this assertion of plenary power over the home. There is none. If Congress can ban home distilling, it can equally ban home cooking and backyard catch. The power claimed by the government in this case is significant, and not the sort of incidental power that is authorized by the Necessary and Proper Clause. All of the plaintiffs in this case have standing, and I'd like to identify what I think is the most straightforward route to the court identifying standing so that it can reach the merits of the question presented. The government concedes that Plaintiff John Prince intends to distill in a garage that is attached to his house that the government recognizes to be a prohibited location. The government admitted as much in its reply brief. That renders Mr. Prince ineligible for the required permit to undertake any distilling activities. This Court's precedents recognize that clear ineligibility for a permit is an appropriate basis for standing. It includes cases like Moore v. United States Department of Agriculture, Ivey v. Williams, and Ellison v. Connor. Moore and Ellison in particular involve circumstances exactly like in this case, where a party did not undertake a complete application. They did not go through all the steps required to apply. Instead, they simply challenged the provision or the policy that would prevent them from being eligible and obtaining the requested permit or benefit, and the Court recognized in both cases that that was sufficient and there was no need to go through the futile gesture of applying for a permit. Mr. Roseman, let me ask you. So Mr. Prince, right, he's the one who says he has a garage that's attached to the house, but he never received a notice. Mr. McNutt did receive the notice, but the government argues he can actually produce distilled spirits or apply for a permit to distill a spirit's beverages within that shed. He would actually be allowed to do so. So the only person who received the notice could actually engage in the conduct that he's challenging. The ones who want to do it in a garage didn't receive the notice, and the District Court found that Mr. Prince and the others did not have standing. Why do they have standing? What's the threat of enforcement against them? Your Honor, when the question is eligibility for a permit, that's a separate basis for  There's no need for an additional threat. And the government conceded that as much below, but it's also just plain as a matter of law. In this instance, obtaining the permit has many different legal repercussions, including in terms of how the tax actually applies. And so simply inability to obtain the permit is an injury in the same way that denial of the permit would be. If there were any possibility that Mr. Prince could obtain the permit, that might be a different instance. But the government has already conceded that Mr. Prince intends to distill in an area that is prohibited, and the government has not identified any other reason why Mr. Prince would not be able to obtain a permit. So that stands on its own. So it would be futile to apply under Ellison that's sufficient for standing? Yes, Your Honor, under Ellison, Moore, and other cases as well. As for Mr. McNutt, the problem that we have here is that the government, as Your Honor has observed, is now proffering a limiting construction of the premises provision, which it did not assert in the court below. It would have been trivial for each of the individual plaintiffs in this case to clarify that exactly where it is they intended to distill within their actual homes, within the dwelling houses in which they reside. But because the government did not contest that the locations they identified were prohibited locations, the plaintiffs didn't have the opportunity to do that. We think the appropriate course in this instance is to recognize that at least Mr. Prince has standing due to his ineligibility for a permit, decide the merits, and then the court can leave for remand the standing of the other individual plaintiffs, which I think the district court could decide in short order given that I will represent every single one of them intends to distill within their dwelling homes or within locations that are expressly prohibited on the face of the statute. On that note, I'll note, for example, that Mr. Morris in his declaration states that he intends to distill in his yard. A yard is, of course, a location that is expressly prohibited by the statute. The limiting construction, well, actually, turning to the merits, the government, as I noted, doesn't really even have a lawyer's argument about how it is that prohibiting most individuals from undertaking a taxable activity somehow is plainly adapted to the collection of tax revenue. It certainly isn't obvious because prohibiting somebody from undertaking a taxable activity does not result, it prevents the completion of the activity that would cause tax liability to accrue. This is precisely the same argument with respect to both necessity and propriety that the Supreme Court rejected in DeWitt, which likewise involved a prohibition on activity that was said to be necessary and proper to the exercise of the taxing power. The Supreme Court held that the prohibition in that instance, at most, would have the effect of channeling some conduct into another form of conduct that then might be subject to taxing. That's the oil and spirits, or oil and whale oil and other oil, right? Yes, Your Honor. It's the lamp oil case. Right. And in that instance, the prohibition was on the manufacturing and marketing of naphtha based lamp oils. And the Court held that even though that might theoretically have the effect of channeling conduct into the production and marketing of different types of oils that were then subject to a taxing regime, that that was simply too speculative and it was not directly connected sufficiently to the excise tax and ultimately to the government's taxing power. But the Court also held that it was not proper for the reason that enacting a prohibition of that sort was an invasion of the state's police power. I think that NFIB versus Sebelius and its reasoning regarding the distinction between the taxing power and the commerce power, as well as the limits of the Necessary and Proper Clause, provides further support for that understanding. Before you get to the Sebelius case, under Witt, but that's the case that also says, but this doesn't apply to distilled liquors, right? It says it distinguished the regulation of the business for distilling liquors, which is closer to what we have here, and the government wants to analogize more to the Felsenheld case, where the Court upheld the ability to regulate the additives to the packaging because that made it more difficult to assess the taxation. Isn't that the rationale that Congress is using here? It is more difficult to determine the taxable amount when you're distilling within your home, and so we need to prohibit it in the same way that they prohibited certain packaging in Felsenheld because of the complications for calculating the tax. Isn't that the same rationale? So, Your Honor, first of all, in DeWitt, the Court specifically referred to measures relating to the collection of the tax on distilled spirits. This has nothing to do with the collection of any tax. It prohibits the activity from the get-go. With respect to the Felsenheld, that's one of a number of cases that addresses, again, regulations that relate to the administration of the tax. So in that instance, that involved the prohibition on including other things in the packages of taxed tobacco, where tobacco is taxed based on weight. And so in that instance, I think what's significant about Felsenheld in these other cases is two things. One, they do relate to the direct administration of the tax. In other words, things about the production of the material or the direct administration of the tax, the weighing, how things are packaged, how things are stamped. And then second, each of those cases, excuse me, none of those cases involves anything like a—none of them apply at all to people, persons who are not subject to the tax in question. And I think that fundamentally is the distinction that the District Court recognized in this case. I mean, it's a completely different thing to prohibit somebody from undertaking an activity versus regulating the manner in which they undertake that activity. And cases like Felsenheld, I think, demonstrate the sort of logic that is required to uphold a measure as necessary and proper with respect to the taxing power. I mean, if you look at Felsenheld, I think if you look at Stilinovic from the Eighth Circuit, they each describe in some detail the rationality of the provision in question. Counsel, you heard Ms. Tan talk about—she mentioned Comstock, which the Supreme Court talks about this very broad power and authority that Congress has in terms of laws that are convenient, useful, or conducive. How does that apply to this case? How do you get around that? Your Honor, I don't think we have to get around it. I think Comstock applied the same standard that's been applied since McCulloch versus Maryland, which is— That's very broad language about what Congress can do. There's broad language, but I would make two points. One, if you look at the actual reasoning of Comstock and the degree to which it assessed the rationality of the provision at issue in that case, it was nothing like rational basis review under the Lee optical line of cases. It is a much more searching inquiry. And second, I would point the Court to Justice Kennedy's concurrence in Comstock, not because it's controlling, but because it's the only decision to address this issue precisely. And it contains a nice, concise recitation of the Court's case law about the degree of connection that is required, making clear that it is a higher standard than the Lee optical standard and that it requires a more searching inquiry of courts for basic fundamental reasons of federalism and the limited nature of the federal government's enumerated powers. But in particular, Justice Kennedy's concurrence looks to such decisions as Lopez and Morrison and also Raich and recognizes that they all require some sort of higher showing by the government and in some instances require some degree of specific factual—I don't want to say court evidence, but in many instances legislative type evidence—demonstrating that the means in question actually do in some way promote the ends at issue. And I want to note that each of those cases, Lopez, Morrison, Raich, as the majority opinion explains in Raich, those are all necessary and proper cases. While they did involve the commerce power, the question in each of the—none of the regulations in those cases regulated interstate commerce per se, but rather conduct that was said to substantially relate to interstate commerce or substantially affect interstate commerce, which was through the necessary and proper clause. And so as Justice Kennedy points out, the standard applied in those cases is, as consistent with McCullough, a different standard than the rational basis there. So I don't think that we have to get around Comstock. But even if the court did look at this as there being a lower standard, the government in this instance I don't think even has a lawyer's argument as to how this possibly furthers the government's interest in tax collection. There simply is no explanation in any of the government's briefing as to why it is that a home would prevent—would supposedly imperil the collection of tax revenue in a way that any other location or facility would not. Indeed, a dwelling—the distinction—a dwelling house might be a building that two weeks earlier was not a dwelling house because nobody resided there. So it might be, in fact, the same exact facility with no greater or lesser ability to hide or disguise the activity taking place. Indeed, the government's narrowing construction, as presented on appeal, further underscores the—I want to say it's more than irrationality, the sort of backwards nature of this argument. Because as the government would now have it, a still located in the house that's right up by the road, that's prohibited. But a shed located—I'm sorry, a still located in a still that's a quarter of a mile back over the hill where nobody can see it from the road, that would then be permissible. We don't think that that's a correct reading of the statute, and it's certainly not how the government has ever applied it. But even putting that aside, it just demonstrates the absurdity of all of this. And the government hasn't explained why it is that the fact that distilled spirits are taxed based on the strength, based on the proof, why that would be any more or less difficult to measure in a home as opposed to any other location within the  Ultimately, the distilled spirits tax applies based on both the proof as well as the quantity. The taxes, the very similar taxes on beer and on wine are also based on quantity. While there is a carve-out for personal production of as little as 100 gallons per year, after that the tax does kick in, and those taxes, like the tax on distilled spirits, also apply at the point and at the time of creation where those alcohols are subject to tax. So again, there really isn't any rationale for why this particular conduct is being singled out with respect to tax collection. Going back to McNutt's standing, which was the only standing that the district court found, the statute says prevents distillation in any shed, yard, or enclosure connected with any dwelling house. So McNutt's yard, by definition, is in the statute. That's what ticked me off about the government's attempt to narrow the reading. Your Honor, we agree, even though that is somewhat against interest in a certain sense, because it's plain on the face of the statute. The statute encompasses yards, and the government's argument now seems to be like, well, if you have a shed that's in a yard, that's different. Obviously, the statute mentions sheds, but I will also note that dwelling house is not an uncertain term. It doesn't come up much in federal law, but it's used all the time in state law with respect to burglary statutes. And a dwelling house typically includes... The curtilage cases. Sometimes it will include curtilage, but it always includes, at a minimum, the place where people dwell, in other words, like the house, and then anything that is directly attached to the house. And so the reference to shed, to sheds, in the prohibition here, cannot possibly be limited to sheds that are attached to the dwelling house, because the term dwelling house already includes that. It would be superfluous otherwise. And your, as I understand the government's position, is that the allowing production of distilled spirits within the home would facilitate the concealment of some of the determining the alcohol content level, monitoring. It sounds like you're contesting that. Do you think it's just as simple to do that as at a factory that has the requisite permit? Am I understanding correctly? It's certainly not obvious to me as to why there would be any difference at all, and there certainly is no evidence supporting the government's assertion in this case. There is a 280-page report that preceded the enactment of the statute at issue here, and not a single page of that report presents the notion that stills were regularly being distilled in dwelling houses or anything like that. To the contrary, two of the tax collectors who were interviewed in the production of that report said that they had never seen stills in dwelling houses. That's at record page 384 and 419. There was a single description of a still being located in a dwelling house, and the problem there was not that it was in the dwelling house. It was that it was unregistered, and that was largely because, so far as this is reported in the report, it was not unknown to the tax collection agent. The owner of the dwelling house and the owner of the still was a friend of the collector who had bribed him. And indeed, when you read the report, that's what you see over and over and over again. The problem that Congress was trying to address by this overall statutory scheme was rampant disregard of the tax through the facility of bribing the tax collectors. The tax was so high, in fact, it was higher than the market price of distilled spirits, that something like seven-eighths of tax revenue was not being collected due to these sorts of machinations. By all indications, the purpose of the home distilling prohibition had nothing to do with rectifying that problem, but instead was a trade-off made to the burgeoning temperance movement. It was proposed by Representative Hooper of Massachusetts, which was a hotbed of prohibition sentiment at that time. There was no debate or discussion about it whatsoever, and to the extent there was some debate or discussion regarding this general set of issues, it was that the notion of reducing the tax from its incredibly high level was opposed by the temperance movement. This was a political horse trade that bought them off. It had nothing to do with the collection of the tax. If the Court has no further questions, I would yield the balance of my time. No, sir. Thank you. You gave us three seconds, right? Yeah. So, Your Honor, I wanted to start off with Prince, which is a plaintiff that opposing counsel stated was the easiest path forward for standing. Just looking at his declaration, his declaration itself says that he has space that could hypothetically be used to distill alcohol. Lujan tells you that your intent has to be specific and concrete. Hypotheticals and speculative desires don't count. Mr. Prince also said that he would need to buy a still, and so there are a number of reasons why he hasn't established a serious intent to actually violate this particular location restrictions. I also wanted to clarify a point of fact. The opposing counsel suggested that we did not challenge the location restrictions below. You can see on ROA 529 that we did. Throughout, we have contested plaintiff's standing because they haven't keyed their actual intent to violate the law. No, I don't think he said that. I think what he was saying was that you didn't proffer a narrowing construction below. Again, I think if you look at 529, we have specifically stated that plaintiff's complaint reflects an apparent misunderstanding of the scope of the challenge.  I take that back, but then I move on to how do you write out of the statute the prohibition about a yard or a shed? The litigation throughout this case has focused on Mr. McNutt's shed. We have said that he has received a permit to distill fuel alcohol in that shed, which is 260 feet away. Now it's a shed. Before, you didn't say it was a shed. We have said it. We have discussed the relevance of Mr. McNutt's shed throughout this litigation, including on 529 in district court. Well, but again, the statute prohibits in a shed, but you say it's, yes, I mean, I quoted it. No, the statute, I mean, what we will say is this is why you should apply for a permit with the agency. The agency takes a look and sees whether or not the location of your still is consistent with what Congress determined. And then the letter said it has come to the TTB's attention that you may have purchased a still capable of producing alcohol or equipment and materials that may be used in the manufacture of a still. And then it warned unlawful production of distilled spirits is a criminal offense. That's correct, Your Honor. At no point does this notice say you may have placed your still in a prohibited location or made any mention of the actual restrictions that are challenged in this case. And again, I want to note that after receiving this notice, Mr. McNutt did receive permission to distill alcohol. And so that undermines any threat of enforcement that this particular notice could provide. Wait, wait, wait, wait. Not spirits or ethanol? Fuel alcohol, yes. That's different. Well, with respect to the location restrictions, again, if the government- For no obvious reason, that's different in federal law. But anyway, I guess I'd ask you, what do you say about the DeWitt case? And what's the implication that you've abandoned the Commerce Clause argument? Because heretofore, it seems to me the Commerce Clause has been the broadest power of federal regulation that could be Filburn and so on. But the government abandoned that in favor of the tax power, which is not what Comstock is about. It is what DeWitt is about, for instance. So Comstock is about the necessary and proper power, Your Honor, and the question here is what's necessary and proper as linked- Let's call it an adjunct power. As linked to, of course, one of Congress's enumerated powers, yes. Starting with DeWitt, so that case, it's actually unclear to me why plaintiffs rely so much on that case, because that case involved an oil that was not subject to tax and actually said that the stilling law was valid because it involved an actual taxable item. I also think that, you know, I'm glad that Judge Rodriguez brought up Felsenheld. Felsenheld sort of says that Congress can regulate taxable tobacco packages even though the tax only went to the tobacco itself. It gives you a clear, like the analysis itself was focused on the rational relationship between what Congress wanted to do and its interest in tax, and it specifies that you can regulate things beyond just the taxable product itself when thinking about whether or not something is necessary and proper under Congress's power. So there are actually laws on the books that regulate the way a still has to be designed and constructed, that's section 5178A2B, as well as, you know, write laws about security measures that have to be taken, locks that have to be attached to the stills. Plaintiffs actually cite that. I believe it's page 57 of their brief as permissible laws within Congress's necessary and proper powers. And so there's— But doesn't Felsenheld say those regulations are allowed, but the blanket prohibition is a step too far? So this is not a blanket prohibition, Your Honor. I think that's a really important point to emphasize. This is not a ban on distilling. This is not even a ban on distilling at home. It's specific location restrictions on residential properties. And so I think that, you know, Felsenheld—well, I see that my time is up, if I may. I would just say that Felsenheld clearly sort of establishes that Congress can regulate things beyond just the tax item, so long as it's reasonable and has that rational relationship. Thank you. Okay. Thank you, Ms. Tan.